IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| STEPHEN W. CHRISTL, | ) |
| | ) |
|     Plaintiff, | ) |
| | ) |
|        vs. | )   Civil Action No. 08-290 |
| | ) |
| MICHAEL J. ASTRUE, | ) |
| Commissioner of Social Security, | ) |
| | ) |
|     Defendant. | ) |

## **MEMORANDUM OPINION**

### **I.   INTRODUCTION**

Pending before the Court are cross-motions for summary
judgment filed by Plaintiff Stephen W. Christl and Defendant
Michael J. Astrue, Commissioner of Social Security. Plaintiff
seeks review of final decisions by the Commissioner denying his
claims for disability insurance benefits ("DIB") under Title II of
the Social Security Act, 42 U.S.C. §§ 401 *et seq.*, and supplemental
security income benefits ("SSI") under Title XVI of the Social
Security Act, 42 U.S.C. §§ 1381 *et seq.* For the reasons discussed
below, Defendant's motion is granted and Plaintiff's motion is
denied.

### **II.   BACKGROUND**

#### A.   Factual Background

Plaintiff Stephen W. Christl was born in 1972. At age 15
he was diagnosed with Type I diabetes mellitus and began treatment

with insulin. (Certified Copy of Transcript of Proceedings before the Social Security Administration, Docket No. 7, "Tr.," at 103.) After graduating from high school and attending one year of college, Mr. Christl worked several years, primarily as a waiter and car salesman. (Tr. 56.)

While living in the Pittsburgh, Pennsylvania, area, Plaintiff's diabetes was treated by Dr. Leila Hosseini at the McKeesport Family Health Center. In March 2003, after he complained of pain throughout his entire body and swelling in his joints, Mr. Christl was diagnosed with rheumatoid arthritis and also with high blood pressure. (Tr. 107, 109.) In May or June of 2005, Plaintiff injured the large toe on his right foot. By the time he consulted a physician, the bone in the toe had become infected and doctors were forced to amputate it. (Tr. 123.) In August 2005, Plaintiff attempted to return to work as a customer sales representative for a spa and hot tub company in Pittsburgh, but quit because he could no longer climb the stairs to get to his second-floor workplace. (Tr. 261.) Soon thereafter, Plaintiff moved to the Meadville area to live with his grandparents.

B.    Procedural Background

On August 16, 2005, Mr. Christl applied for disability and supplemental security income benefits, claiming disability beginning May 30, 2005, due to diabetes, amputation of his toe, and rheumatoid arthritis. (See Tr. 40-44 and 242-244, respectively;

2

Tr. 55.) Both applications were initially denied on November 14, 2005 (Tr. 32, 245), after which Plaintiff timely requested a hearing before an Administrative Law Judge ("ALJ.")

On April 17, 2007, a video hearing[1] was held before the Honorable James J. Quigley at which Plaintiff was represented by counsel; Mr. Samuel E. Edelmann, a vocational expert, also appeared and testified. Judge Quigley issued his decision on July 10, 2007, again denying DIB and SSI benefits. (Tr. 13-23.) The Social Security Appeals Council declined to review the ALJ's decision on December 28, finding no reason pursuant to its rules to do so. (Tr. 5-7.) Therefore, the July 10, 2007 opinion became the final decision of the Commissioner for purposes of review. 42 U.S.C. § 405(h); Rutherford v. Barnhart, 399 F.3d 546, 549-550 (3d Cir. 2005), *citing* Sims v. Apfel, 530 U.S. 103, 107 (2000). Plaintiff filed suit in this Court on February 26, 2008, seeking judicial review of the ALJ's decision.

C.  Jurisdiction

This Court has jurisdiction by virtue of 42 U.S.C. § 1383(c)(3) (incorporating 42 U.S.C. § 405(g)) which provides that an individual may obtain judicial review of any final decision of

---

[1] Hearings held by videoconferencing technology are authorized by 20 C.F.R. §§ 404.936(c) and 416.1436(c), which provide that an ALJ has discretion to conduct the entire hearing or the appearance of any witness by video teleconferencing if the technology is available to conduct the appearance; teleconferencing would be more efficient than conducting the appearance in person; and there are no circumstances which would prevent the use of video teleconferencing.

the Commissioner by bringing a civil action in the district court of the United States for the judicial district in which the plaintiff resides.

## III. STANDARD OF REVIEW

The scope of review by this Court is limited to determining whether the Commissioner applied the correct legal standards and whether the record, as a whole, contains substantial evidence to support the Commissioner's findings of fact. 42 U.S.C. § 405(g); Richardson v. Perales, 402 U.S. 389 (1971); Schaudeck v. Comm'r of Soc. Sec. Admin., 181 F.3d 429, 431 (3d Cir. 1999). Findings of fact by the Commissioner are considered conclusive if they are supported by "substantial evidence," a standard which has been described as requiring more than a "mere scintilla" of evidence, that is, equivalent to "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Richardson, id. at 401. "A single piece of evidence will not satisfy the substantiality test if the [ALJ] ignores, or fails to resolve a conflict, created by countervailing evidence." Kent v. Schweiker, 710 F.2d 110, 114 (3d Cir. 1983).

This Court does not undertake de novo review of the decision and does not re-weigh the evidence presented to the Commissioner. Schoengarth v. Barnhart, 416 F. Supp.2d 260, 265 (D. Del. 2006), citing Monsour Medical Center v. Heckler, 806 F.2d 1185, 1190 (3d Cir. 1986) (the substantial evidence standard is deferential,

4

including deference to inferences drawn from the facts if they, in turn, are supported by substantial evidence.) If the decision is supported by substantial evidence, the Court must affirm the decision, even if the record contains evidence which would support a contrary conclusion. Panetis v. Barnhart, CA No. 03-3416, 2004 U.S. App. LEXIS 8159, \*3 (3d Cir. Apr. 26, 2004), citing Simmonds v. Heckler, 807 F.2d 54, 58 (3rd Cir. 1986), and Sykes v. Apfel, 228 F.3d 259, 262 (3rd Cir. 2000).

## IV. **LEGAL ANALYSIS**

### A. The ALJ's Determination

In determining whether a claimant is eligible for supplemental security income, the burden is on the claimant to show that he has a medically determinable physical or mental impairment (or combination of such impairments) which is so severe he is unable to pursue substantial gainful employment[2] currently existing in the national economy.[3] The impairment must be one which is expected to result in death or to have lasted or be expected to last not less than twelve months. 42 U.S.C. § 1382c(a)(3)(C)(i); Morales v. Apfel, 225 F.3d 310, 315-316 (3d Cir. 2000). To be

---

[2] According to 20 C.F.R. § 416.972, substantial employment is defined as "work activity that involves doing significant physical or mental activities." "Gainful work activity" is the kind of work activity usually done for pay or profit.

[3] The claimant seeking supplemental security income benefits must also show that his income and financial resources are below a certain level. 42 U.S.C. § 1382(a).

5

granted a period of disability and receive disability insurance benefits, a claimant must also show that he contributed to the insurance program, is under retirement age, and became disabled prior to the date on which he was last insured. 42 U.S.C. § 423(a); 20 C.F.R. § 404.131(a). The Commissioner does not dispute that Mr. Christl satisfied the first two non-medical requirements, and the parties agree that Plaintiff's date last insured will be June 30, 2010.

To determine a claimant's rights to either SSI or DIB,[4] the ALJ conducts a formal five-step evaluation:

(1) if the claimant is working or doing substantial gainful activity, he cannot be considered disabled;

(2) if the claimant does not suffer from a severe impairment or combination of impairments that significantly limits his ability to do basic work activity, he is not disabled;

(3) if the claimant does suffer from a severe impairment which meets or equals criteria for an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1 ("the Listings") and the condition has lasted or is expected to last continually for at least twelve months, the claimant is considered disabled;

(4) if the claimant retains sufficient residual functional capacity ("RFC") to perform his past relevant work, he is not disabled; and

(5) if, taking into account his RFC, age, education, and past work experience, the claimant can perform other work that exists in the local, regional or national economy, he is

---

[4] The same test is used to determine disability for purposes of receiving either type of Social Security benefits. Burns v. Barnhart, 312 F.3d 113, 119, n.1 (3d Cir. 2002). Therefore, courts routinely consider case law developed under both SSI and DIB programs.

6

not disabled.

20 C.F.R. § 416.920(a)(4); *see also* <u>Morales</u>, 225 F.3d at 316.

In steps one, two, and four, the burden is on the claimant to present evidence to support his position that he is entitled to Social Security benefits, while in the fifth step the burden shifts to the Commissioner to show that the claimant is capable of performing work which is available in the national economy.[5] <u>Sykes v. Apfel</u>, 228 F.3d 259, 263 (3d Cir. 2000).

Following the prescribed analysis, Judge Quigley first concluded that Mr. Christl had worked for a brief period as a customer service representative in August 2005, some two months after his alleged disability onset date. However, he concluded this was an unsuccessful work attempt inasmuch as Plaintiff had discontinued working because he could not climb the stairs to his work location after amputation of his toe on June 16, 2005. (Tr. 15.) Resolving step two in Plaintiff's favor, the ALJ found that his severe[6] impairments included uncontrolled insulin dependent

---

[5] Step three involves a conclusive presumption based on the listings, therefore, neither party bears the burden of proof at that stage. <u>Sykes</u>, 228 F.3d at 263, n2, *citing* <u>Bowen v. Yuckert</u>, 482 U.S. 137, 146-147 n.5 (1987).

[6] *See* 20 C.F.R. §§ 404.1520(c), 404.1521(a), and 140.1521(b), stating that an impairment is severe only if it significantly limits the claimant's "physical ability to do basic work activities," i.e., "abilities and aptitudes necessary to do most jobs, including, for example, walking, standing, sitting, lifting, pushing, pulling, reaching, carrying or handling," as compared to "a slight abnormality" which has such a minimal effect that it would not be expected to interfere with the claimant's ability to work, regardless of his age,

7

diabetes mellitus, status-post amputation of the right great toe, peripheral neuropathy,[7] and rheumatoid arthritis, all of which had a significant effect on Mr. Christl's ability to lift and carry heavy weights, stand for prolonged periods of time, perform postural activities, and work in environmentally hazardous conditions. (Tr. 16.)

At step three, the ALJ concluded Plaintiff's impairments, either alone or in combination, did not meet or medically equal any of the listed impairments. He specifically considered Plaintiff's diabetes mellitus with neuropathy against Listing 9.08; the amputation of his toe against Listing 1.05, and his rheumatoid arthritis against Listing 14.09. (Tr. 16-17.)

In the first part of step four, the ALJ concluded Mr. Christl had the residual functional capacity for sedentary work in that he had the ability to

> lift up to 20 pounds occasionally and 10 pounds
> frequently. During the course of an 8-hour workday he
> can sit for up to 8 hours. . .perform jobs which permit

education, or work experience. Yuckert, 482 U.S. at 149-151. The claimant has the burden of showing that the impairment is severe. Id. at 146, n.5.

[7] Peripheral neuropathy is a condition in which the nerves beyond the brain and spinal cord (i.e., the peripheral nerves) fail to function properly, resulting in pain, loss of sensation or inability to control muscles. There are numerous causes for this common condition, among which is diabetes mellitus. Neuropathy can affect the sensory, motor or autonomic nerves and the symptoms will vary according to the type(s) of nerves involved. See the medical encyclopedia maintained by the National Institute of Medicine at www.nlm.nih.gov/medlineplus (last visited September 24, 2008), "Medline Plus."

8

standing for 15 minutes every couple of hours [and] . . . require no balancing or crouching and no more than occasional kneeling, bending, or stooping. [He] can perform jobs with no requirement for climbing stairs during the course of the job except to get to the workplace[, and] . . . jobs [that] do not require driving or operating heavy moving equipment or machinery, working at unprotected heights, or climbing such things as ropes, ladders, or scaffolds.

(Tr. 17.)

In arriving at this description of Plaintiff's residual functional capacity, Judge Quigley specifically considered Plaintiff's non-exertional limitations and subjective symptoms, that is, the side effects associated with his uncontrolled low blood glucose, balance problems as a result of his toe amputation and neuropathy, and pain and swelling in his foot. (Tr. 17-19.) The ALJ concluded that although these medically determinable impairments could reasonably be expected to produce the symptoms described by Mr. Christl, his statements regarding the intensity, persistence, and limiting effects thereof were not entirely credible. (Tr. 19, 21.)

Also at step four, the ALJ concluded Plaintiff could not perform his past relevant work as a car salesman or waiter which Mr. Samuel Edelmann, the vocational expert ("VE") who testified at the hearing, had described as light/semi-skilled and light/ unskilled work, respectively. (Tr. 22; *see also* Tr. 279.)

In response to the ALJ's hypothetical question at the hearing, Mr. Edelmann had testified there were numerous jobs which an

individual of Mr. Christl's education, experience, and non-exertional limitations could perform in the local or national economy; he provided the examples of telephone solicitor, order clerk, and assembler. (Tr. 22; *see also* Tr. 280.) Based on Plaintiff's status as a younger individual[8] with more than a year of college, the ability to communicate in English, the immateriality of the existence of any transferable job skills, the medical evidence of record, and the testimony of Plaintiff and the VE, the ALJ determined at step five that Mr. Christl was not disabled and, consequently, not entitled to benefits. (Tr. 22-23.)

B. Plaintiff's Arguments

While Plaintiff's arguments are not well delineated in the brief in support of his motion for summary judgment, we discern the following four arguments, all falling under the general contention that the record fails to disclose substantial evidence to support the ALJ's decision that Plaintiff is not entitled to disability benefits:

1.  The ALJ failed to give appropriate weight to the medical opinions of Plaintiff's treating physicians, in particular an assessment completed by Dr. Barella[9] on March 23, 2006 (Tr. 189-191), and the opinion by Dr.

---

[8] Plaintiff was 33 years old on his alleged disability onset date, making him a "younger" person according to Social Security regulations. 20 C.F.R. §§ 404.1563(c) and 416.963(c).

[9] This physician is referred to at various points in the record as "Barella," "Buretta," and "Baretta." No first name is readily apparent. We have chosen to adopt the form used by the ALJ in his opinion, "Barella."

10

Farooq Hassan dated April 16, 2007, that Plaintiff's
diabetes mellitus with neuropathy satisfied Listing 9.08A
(Tr. 180-181.) (Brief for Plaintiff, Docket No. 10,
"Plf.'s Brief," at 5-9.)

2.    The ALJ erred in his credibility analysis in that he
failed to explain why Plaintiff's testimony was not fully
credible and failed to acknowledge that his testimony was
supported by the medical evidence. (Plf.'s Brief at 9-
13.)

3.    The ALJ erred by failing to recognize that Mr. Christl's
consistent work record for at least 13 years should have
given increased weight to his testimony concerning his
limitations. (Id. at 13.)

4.    "When the vocational expert considered the above
limitations, he concluded that the claimant could not
sustain work at the substantial gainful work activity
level." (Id. at 13.)

We address each of these arguments in turn.

        1.    *Failure to give appropriate weight to the medical*

*opinions of Drs. Barella and Hassan:* Plaintiff's primary argument

is that the ALJ failed to properly assess valid medical evidence

from two of his treating physicians, Drs. Barella and Hassan.[10]

_____

[10]    In connection with this argument, Plaintiff also contends
Judge Quigley erred by substituting his lay opinion for that of
Plaintiff's treating physicians and by substituting his evaluation of
the medical records and documents for that of the treating physicians.
(Plf.'s Brief at 8.) However, Plaintiff provides no examples of where
the ALJ substituted his opinion for that of any treating physician;
moreover, the case upon which he relies, Allen v. Bowen, 881 F.2d 37,
41, 42 (3d Cir. 1989), does not address this issue although the
principle is correct. *See* Morales v. Apfel, 225 F.3d 310, 318 (3d
Cir. 2002) ("Although an ALJ may consider his own observations of the
claimant and this Court cannot second-guess the ALJ's credibility
judgments, they alone do not carry the day and override the medical
opinion of a treating physician that is supported by the record. . . .
The ALJ cannot. . .disregard [a] medical opinion based solely on his
own amorphous impressions, gleaned from the record and from his
evaluation of the claimant's credibility.") (Internal alterations and
quotations omitted.) Similarly, Plaintiff provides no examples of

11

With regard to Dr. Barella, the ALJ purportedly failed to give proper weight to the opinions expressed in a "Medical Source Statement of Claimant's Ability to Perform Work-Related Physical Activities" dated March 23, 2006; erroneously concluded that Dr. Barella was not a treating physician and that his opinions were not supported by the record; and failed to recognize that medical evidence provided by other physicians also supported Dr. Barella's conclusion that Plaintiff was disabled. (Plf.'s Brief at 5-7.) As for Dr. Hassan's opinion, the ALJ allegedly failed to mention the assessment dated April 16, 2007, in which Dr. Hassan concluded that Plaintiff satisfied Listing 9.08A. (Id. at 7-9.)

Social Security regulations carefully set out the manner in which opinions from the various medical sources will be evaluated. 20 C.F.R. § 416.927. In general, every medical opinion received is considered. Unless a treating physician's opinion is given "controlling weight," the ALJ will consider (1) the examining relationship (more weight given to the opinion of an examining source than to the opinion of a non-examining source); (2) the

---

instances in which the ALJ independently reviewed and interpreted the medical evidence contrary to the findings of Mr. Christl's treating physicians, although, once again, the general principle is correct. See Morales, id. at 317 ("In choosing to reject the treating physician's assessment, an ALJ may not make speculative inferences from medical reports and may reject a treating physician's opinion outright only on the basis of contradictory medical evidence and not due to his or her own credibility judgments, speculation, or lay opinion." (Internal citation and quotations omitted.) Because Plaintiff has failed to support these arguments, we do not address them in detail.

treatment relationship (more weight given to opinions of treating sources); (3) the length of the treatment relationship and the frequency of examination (more weight given to the opinion of a treating source who has treated the claimant for a long time on a frequent basis); and (4) the nature and extent of the treatment relationship (more weight given to the opinions of specialist than to generalist treating sources.) 20 C.F.R. § 416.927; *see also* Adorno v. Shalala, 40 F.3d 43, 47-48 (3d Cir. 1994) ("greater weight should be given to the findings of a treating physician than to a physician who has examined the claimant as a consultant" and the least weight given to opinions of non-examining physicians.) The opinions of a treating source are given controlling weight on questions of the nature and severity of the claimant's impairment(s) when the conclusions are "well-supported by medically acceptable clinical and laboratory diagnostic techniques and [are] not inconsistent with the other substantial evidence in [the] record." 20 C.F.R. §§ 416.927(c)and 404.1527(d)(2).

a. Turning first to the medical records from Dr. Barella, the ALJ explicitly referred to the medical source statement provided at the hearing. (Tr. 21; 260.) He accurately summarized the physician's findings therein, e.g.,

- Plaintiff could occasionally lift up to 20 pounds and occasionally carry two or three pounds;
- he could stand and walk for one hour or less in an 8-hour day;

13

- he could sit for six hours but should elevate his foot every two hours for periods of ten minutes;

- he had limited ability for pushing and pulling due to the amputation of his right great toe;

- he could occasionally bend, kneel, stoop, and balance; he could never crouch; and his ability to climb was ambiguously described as both "occasionally" and "never;"

- Plaintiff was subject to numerous postural, manipulative, and environmental limitations.

(Tr. 21; see also Tr. 189-191.)

Judge Quigley gave two reasons for rejecting Dr. Barella's assessment: first, it appeared that he was not a treating physician because he was not mentioned anywhere else in the record; and second, his opinion was not supported by the record. (Tr. 21.)

We first conclude that the ALJ may be excused for concluding no medical notes from Dr. Barella appeared in the record. The evidence shows that the medical records to which Plaintiff refers are identified as those of Conneaut Valley Health Center; neither Dr. Barella nor any other doctor is mentioned by name in the cover letter or in the progress notes themselves. (See Exhibit 8F, Tr. 207-212.) The only reason this Court has been able to determine that Plaintiff is correct in his assertion that at least part of the progress notes in this exhibit are those of Dr. Barella is the similarity between the signature on the medical source statement and that on three pages of the progress reports.

Plaintiff points out that in his report of recent medical

14

treatment received by the Social Security Administration on February 23, 2007, he indicated he consulted with Dr. Barella every three to six months at the same office as that of Dr. Frank McLaughlin (Tr. 98) and that he had been treated by Dr. Barella for the period August 19, 2005, through June 22, 2006. (Plf.'s Brief at 6.) We agree that the document at Tr. 98 supports the first part of Plaintiff's statement, but the medical evidence does not support his contention that Dr. Barella provided regular medical care for almost a year.

The medical records cover five appointments during the noted period, however, Dr. Barella did not treat Plaintiff at the first two on August 19 and October 3, 2005. (Tr. 212.) This is confirmed by Plaintiff's statement of changes in his health care dated December 16, 2005, in which he did not list Dr. Barella as one of his physicians. (Tr. 79-85.) In his January 19, 2006 notes, Dr. Barella refers to the fact that this was Plaintiff's "initial visit with me." (Tr. 210.) He also provided treatment on March 23, and June 22, 2006. (Tr. 209.) These progress notes show that Dr. Barella provided only diabetic foot care. For instance, on January 19, 2006, Plaintiff was treated for a minor ingrown toenail on his left great toe, overgrown toenails, and a rash on his left foot. (Tr. 210.) On March 23, Dr. Barella trimmed his toenails and treated the rash, which was almost resolved (Tr. 209), and on June 22, 2006, he again treated the

15

ingrown toenail and trimmed Plaintiff's thickened nails (Tr. 208.)
He provided no other treatment for Plaintiff's rheumatoid
arthritis, diabetes, or after-effects of the toe amputation.

Moreover, even if we consider Dr. Barella's notes in their
entirety, we agree with the ALJ that they do not support his
assessment. For instance, despite being asked to provide medical
findings to support his limitations on Plaintiff's ability to lift,
carry, stand or walk for more than one hour, and his postural
activities, he failed to do so. (Tr. 189-190.) It is well-
established in this Circuit that a form document in which a
physician simply checks a box but does not provide objective
evidence to support his conclusions is entitled to little weight.
*See* Zonak v. Comm'r of Soc. Sec., No. 07-3143, 2008 U.S. App. LEXIS
15885, *7 (3d Cir. July 24, 2008), *citing* Mason v. Shalala, 994
F.2d 1058, 1065 (3d Cir. 1993) for the principle that "[f]orm
reports in which a physician's obligation is only to check a box or
fill in a blank are weak evidence at best." Thus, the records
which can be directly attributed to Dr. Barella do not support the
extreme limitations he described in his medical assessment, e.g.,
the ability to carry no more than two or three pounds and to sit
for no more than six hours in an eight-hour workday.

As for Plaintiff's argument that other medical treatment
records support those conclusions, there is no evidence that Dr.
Barella relied on records of any other physician in arriving at his

16

assessment, except, perhaps, those of Dr. McLaughlin with whom he shared a practice. As Plaintiff points out, Dr. McLaughlin's records for the period August 19, 2005, through April 11, 2007 (Tr. 227-238), reflect diagnoses of diabetes mellitus, rheumatoid arthritis, and hypertension; however, they do not contain any evidence which would support Dr. Barella's assessment. In fact, most appointments were simply medication checks, blood pressure checks, and laboratory tests; the only medical treatment he received was on September 11, 2006, when he developed a small (5 cm) infection on his arm which apparently resolved before his next appointment on September 25, 2006, since it was not mentioned. (Tr. 229-230.) Dr. Barella had indicated that in addition to physical limitations with his hands,[11] Plaintiff was impaired in his ability to see, hear, speak, taste, and smell and his continence was affected by his impairments, but the Court can find no reference to such limitations elsewhere in the record. Finally, Dr. Barella's conclusion that Plaintiff could not lift and carry more than two or three pounds is contradicted not only by Mr. Christl's statement to a consultative examiner, Dr. Iftikhar A. Chatha, in September 2005 that he could carry 50 pounds (Tr. 169), but by his report in a daily activities questionnaire, also dating

---

[11] Plaintiff's ability to use his hands for handling, fingering or feeling functions could reasonably be considered limited due to rheumatoid arthritis, but Dr. Barella's progress notes do not mention such limitations nor did he treat Plaintiff for any impairments associated with rheumatoid arthritis.

17

from September 2005, that he could carry up to ten pounds, despite difficulty walking due to his recent amputation. (Tr. 74.)

Having reviewed all the medical evidence and the ALJ's opinion, we conclude that contrary to Plaintiff's argument, Judge Quigley did not err by failing to give great or controlling weight to Dr. Barella's medical source statement.

b. As for Dr. Hassan's assessment which Plaintiff also argues should have been given substantial weight, we again agree with the ALJ that there is no support for the opinion that Plaintiff's diabetes mellitus satisfied Listing 9.08A. At the hearing, Mr. Christl provided the ALJ with a pre-printed document signed by Dr. Hassan on April 16, 2007, which indicated he believed Plaintiff satisfied Listing 9.08A, that is:

Diabetes mellitus [with] neuropathy demonstrated by significant and persistent disorganization of motor function in two extremities resulting in sustained disturbance of gross and dexterous movements, or gait and station (see 11.00C).

(Tr. 180-181.)[12]

In support of his opinion, Dr. Hassan provided the results of

---

[12] Listing 9.08 may also be satisfied if the claimant's medical records show either a history of acidosis [an abnormal condition of reduced alkalinity of the blood and tissue as the result of abnormal acid production] occurring at least on the average of once every two months and documented by appropriate blood chemical tests (Listing 9.08B), or evidence of retinitis proliferans [neovascularization of the retina] which results in one of the three visual impairments set out in Listing 2.02, 2.03, or 2.04 (Listing 9.08C.) Plaintiff does not argue in the alternative that he satisfied Listing 9.08B or 9.08C and the Court will not discuss those Listings. See dictionary entries at Medline Plus for definitions incorporated herein.

electromyography testing performed on February 1, 2007, by Dr. Stephen G. Paxson. (Tr. 183-185.) The physical examination showed "pretty good strength" and intact response to stimuli, although Mr. Christl complained of "some decreased sensation." (Tr. 183.) Nerve motor studies were performed on Plaintiff's upper and lower extremities as well as sensory studies and electromyography on some major muscle groups, some hand and foot muscles, and both upper extremities. Dr. Paxson's impression was severe peripheral motor and sensory neuropathy of both lower extremities; severe sensory neuropathy of both upper extremities; moderate motor neuropathy of bilateral median nerves, and electromyography "consistent with some evidence of neuropathic findings on needle examination, although not nearly as severe as what we found with the conduction velocities." (Tr. 184.)

The medical record also includes Dr. Hassan's progress notes for the four-month period October 30, 2006, through March 2, 2007. (Tr. 213-224.) On October 30, 2006, Dr. Hassan indicated he had been asked to provide a rheumatology consultation by Dr. McLaughlin. He first noted Plaintiff's history of migratory inflammatory arthritis affecting his knees, shoulders, hands, and wrists for a "year or two" beginning in 2003. He had been diagnosed with rheumatoid arthritis and prescribed sulfasalazine[13]

---

[13] Among other uses, sulfasalazine in its extended release form is an anti-inflammatory drug used to treat rheumatoid arthritis in adults and children whose disease has not responded well to other

19

which was apparently effective until sometime in 2006. Dr. Hassan's review of systems was negative except for arthralgias and stiffness and on physical examination he noted no active synovitis in the hands, wrists, elbows shoulders, knees, ankles or toes. Mr. Christl had a fair range of motion in all joints, muscle power was 5/5 in all muscle groups, and he had good deep tendon reflexes bilaterally. Dr. Hassan confirmed the diagnosis of chronic rheumatoid arthritis, but concluded that overall Plaintiff was doing well. A number of blood tests and x-rays of his hands, wrists, feet, and ankles were ordered, but no new medication was prescribed. (Tr. 222-224.)

In the notes from November 22, 2006, Dr. Hassan remarked that the blood tests had disclosed a high sedimentation rate, anemia, and significant high titer rheumatoid factors and anti-CCP antibodies; the x-rays had shown significant degenerative changes. Between the two appointments, Plaintiff had been prescribed prednisone.[14] Mr. Christl reported improvement in his joint pain and stiffness, although he continued to have pain in his hands and wrists. No active synovitis was detected and again he had a fair

medications. *See* drugs and supplements entry at Medline Plus.

[14] Among other uses, prednisone is a corticosteroid used alone or with other medications to treat certain types of arthritis by reducing swelling and redness and by changing the way the immune system works. *See* drugs and supplements entry at Medline Plus.

20

range of motion in all joints. Dr. Hassan prescribed methotrexate[15] to be taken at the rate of five tablets per week and decreased the prednisone dosage. (Tr. 220-221.) On December 22, 2006, Dr. Hassan noticed mild persistent active synovitis in the joints of Plaintiff's hands and wrists (Tr. 218-219) and on January 17, 2007, although his condition was described as essentially unchanged, Dr. Hassan ordered the electromyography performed by Dr. Paxson, the results of which are summarized above. (Tr. 216-217.)

According to the progress notes from Plaintiff's final visit to Dr. Hassan on March 2, 2007, after he began taking enbrel,[16] he reported improvement in his joint pain and stiffness. Dr. Hassan noted "significant" improvement in the synovitis in the joints of his hands and wrists with a fair range of motion in the rest of his joints and muscle power rated as 5/5 in proximal and distal muscles. Dr. Hassan suggested that because he was responding well to the combination of methotrexate and enbrel, he should discontinue taking prednisone. (Tr. 214-215.)

Plaintiff appears to argue that being diagnosed with and

---

[15] Methotrexate is used to treat rheumatoid arthritis by slowing the activity of the immune system. Because it may cause very serious side effects, it is prescribed only for those severe conditions which cannot be treated with other medications. *See* drugs and supplements entry at Medline Plus.

[16] Enbrel (etanercept) is used either alone or in combination with methotrexate to relieve the symptoms of certain autoimmune disorders including rheumatoid arthritis. See drugs and supplements entry at Medline Plus.

treated for a severe impairment is sufficient to award benefits at step two of the analysis. This position is contrary to established case law which holds that the claimant must present evidence not only of medical diagnoses, but also of associated limitations which *significantly* limit his or her ability to do basic work activities or to cope with the mental demands of working. *See* Salles v. Comm'r of Soc. Sec., No. 06-2799, 2007 U.S. App. LEXIS 15304, *7 (3d Cir. June 26, 2007), *citing* 20 C.F.R. §§ 404.1520(c), 404.1521(a) (emphasis in original.) Here, despite evidence of severe neuropathy, there is no evidence that the resultant limitations rise to the level of satisfying Listing 11.00(C) which is incorporated by reference in Listing 9.08A. According to Listing 11.00(C), "persistent disorganization of motor function" refers to "paresis or paralysis, tremor or other involuntary movements, or ataxia and sensory disturbances" which may be due to peripheral nerve dysfunction as well as other causes. "The assessment of impairment depends on the degree of interference with locomotion and/or interference with the use of fingers, hands, and arms." Neither Dr. Hassan's notes nor the medical evidence from Dr. Phillip Klahr who treated Plaintiff for arthritis while he was still living in Pittsburgh (Tr. 193-206) contains any reference to persistent disorganization of motor function in any of Plaintiff's extremities. The medical evidence is substantiated by Plaintiff's own admission at the hearing when he testified, "I have arthritis

22

but. . .that wouldn't prevent me from working."  (Tr. 267.)

Determination of whether an individual's impairment meets or is equivalent in severity to any Listing is an issue reserved to the Commissioner.  While a treating source's opinion on this issue may not be ignored, the ALJ must explain the consideration given to such opinions, even though they are never entitled to controlling weight or special significance.  Social Security Ruling ("SSR") 96-5p, "Medical Source Opinions on Issues Reserved to the Commissioner."[17]  Here, the ALJ acknowledged that there was medical evidence of severe neuropathy based on Dr. Paxson's examination and that Plaintiff had been treated with medication for this condition. (Tr. 16.)  Furthermore, he specifically cited to Dr. Hassan's medical records showing a long history of rheumatoid arthritis. (Id., *citing* Exhibit 9F, Tr. 213-224; *see also* Tr. 20-21, summarizing Dr. Hassan's records in detail.)  He also acknowledged that Plaintiff's counsel had suggested that Mr. Christl's diabetes mellitus satisfied Listing 9.08A, but rejected that suggestion on the basis of specific evidence of record showing independence in activities of daily living and mobility, a fair range of motion in

---

[17] "Social Security Rulings are agency rulings published 'under the authority of the Commissioner of Social Security' and 'are binding on all components of the Social Security Administration.'"  Sykes, 228 F.3d at 271, *citing* 20 C.F.R. § 402.35(b)(1); Williams v. Barnhart, No. 05-5491, 2006 U.S. App. LEXIS 30785, * 8 (3d Cir. Dec. 13, 2006). "Rulings do not have the force and effect of the law or regulations but are to be relied upon as precedents in determining other cases where the facts are basically the same."  Sykes, id., *quoting* Heckler v. Edwards, 465 U.S. 870, 873 n.3 (1984).

23

all joints, no requirement for an assistive device and no significant difficulty performing manipulative activities. (Tr. 16, again citing Exhibit 9F.) The ALJ therefore satisfied the requirement of SSR 96-5p that when the record contains an opinion from a medical source on an issue reserved to the Commissioner, the ALJ must evaluate all the evidence to determine the supportability of the physician's opinion and its consistency with the record as a whole. As SSR 96-5p further points out, "[i]n most instances, the requirements of listed impairments are objective, and whether an individual's impairment manifests these requirements is simply a matter of documentation." Contrary to Plaintiff's argument, in the absence of any objective medical evidence indicating that his neuropathy resulted in the "sustained disturbance of gross and dexterous movements or gait and station" as required by the Listing, we conclude the ALJ did not err by refusing to give significant weight to Dr. Hassan's opinion that Plaintiff satisfied Listing 9.08A.

2. *The ALJ's credibility analysis:* Plaintiff argues that the ALJ failed to explain why Mr. Christl's testimony at the hearing was not fully credible and failed to acknowledge that his testimony was supported by the medical evidence. (Plf.'s Brief at 9-13.) Again, we find this argument not to be persuasive.

Credibility determinations are uniquely the province of the adjudicator and this Court will generally not disturb such

24

decisions. <u>Reefer v. Barnhart</u>, 326 F.3d 376, 380 (3d Cir. 2003). This is particularly true where the ALJ has identified the evidence and reasoning which support his decision. *See* <u>Horodenski v. Comm'r of Soc. Sec.</u>, No. 06-1813, 2007 U.S. App. LEXIS 2874, *15 (3d Cir. Feb. 7, 2007) (where the ALJ has articulated reasons supporting a credibility determination, that determination is entitled to great deference and will be reversed only in extraordinary cases.) We conclude that inconsistencies between the medical evidence and Plaintiff's testimony provide a more than sufficient basis from which the ALJ could reasonably find Mr. Christl's descriptions of his impairments and his inability to work were not fully credible.

The ALJ properly concentrated on the impairments resulting from Plaintiff's fluctuating blood sugar levels and the associated effects because Mr. Christl specifically indicated he believed these were his most severe problems. (Tr. 267.) In his testimony, he did not refer to any limitations imposed by hypertension, and although he mentioned difficulties walking and standing, he did not indicate these were so severe that they would preclude all forms of substantial gainful activity, particularly if he were able to elevate his foot for short periods several times a day in order to avoid swelling. As noted above, he further stated he did not believe his arthritis would prevent him from working. Mr. Christl did testify that his blood sugar level fluctuates significantly; that is, it is sufficiently low three or four times a month that he

is physically exhausted and must sleep several hours. Conversely, when his blood sugar is excessively high, he is sleepy, drowsy and has difficulty concentrating, a situation which occurs once or twice a month. (Tr. 267-273.)

As Plaintiff concedes, the ALJ summarized his hearing testimony in great detail. (Tr. 18-19; see also Plf.'s Brief at 9-11.) In fact, Plaintiff does not point to any portion of his testimony which the ALJ omitted or mischaracterized except that he purportedly "minimized the effects of the claimant's fluctuating sugars by indicating that they may cause some dizziness." (Plf.'s Brief at 11.) Following the summary of Mr. Christl's testimony, the ALJ stated in his opinion:

> After considering the evidence of record, the undersigned finds that the claimant's medically determinable impairments could reasonably be expected to produce a degree of the alleged symptoms, but that the claimant's statements concerning the intensity, persistence, and limiting effects of these symptoms are not entirely credible.

(Tr. 19.)

Judge Quigley went on to summarize, again in great detail, all the medical evidence in the record which supported that conclusion.

(Tr. 19-21.) He then stated:

> The undersigned does not doubt that Mr. Christl is limited by his impairments. However, the totality of the evidence of record does not support his allegations of totally debilitating limitations. The undersigned finds that he is not completely credible. The medical records do not describe a person crippled by neuropathy, diabetes and rheumatoid arthritis. . . .The [electromyography]

26

results were abnormal, but sensory and motor functioning has basically been reported as normal. The claimant has an amputated toe which caused him problems. He experiences joint stiffness at times due to rheumatoid arthritis. Fluctuating sugar levels may cause dizziness. Even with those considerations, after careful scrutiny of the totality of the evidence of record, the undersigned concludes that the claimant is capable of performing at least sedentary work.

(Tr. 21.)

One basis on which an ALJ may reject the claimant's testimony as to the severity of his impairments is inconsistency between the testimony and the medical evidence. Burns v. Barnhart, 312 F.3d 113, 130-131 (3d Cir. 2002). Here, the ALJ noted exactly such inconsistencies when he concluded that Plaintiff's impairments could reasonably be expected to produce the alleged symptoms, but that his statements regarding the severity of those symptoms were not entirely credible. A review of the record shows the ALJ was correct. As only one example, Plaintiff testified that he was compliant with "all of the requirements and suggestions" of his doctors since May 2005. (Tr. 272.) However, the medical evidence shows that on June 16, 2005, immediately prior to the amputation of his toe, his doctor noted that despite a history of insulin dependent diabetes mellitus since about age 18, "[h]e does not really check his sugar at home." (Tr. 126.) On September 27, 2005, Dr. Chatha reported that "the diabetes, according to him, is under fairly good control." (Tr. 167.) On January 3, 2006, a nurse practitioner at Conneaut Valley Medical Center noted, "He

states that he's not been taking his [medication] as ordered, he takes it about once per week. He's unsure where his sugars have been running as he hasn't been checking them. He reports he has the glucometer, but just doesn't use it. He continues to smoke 1 pack per day." (Tr. 235.) Mr. Christl reported on July 3, 2006, that he had not experienced any hypoglycemic episodes for the past three months. (Tr. 232.) In short, the medical evidence belies Plaintiff's testimony that he was fully compliant with the directives of his medical providers and that he experiences hypo- and/or hyperglycemic episodes several times a month. Nor has the Court been able to identify any medical evidence that he ever reported to his physicians the severe drowsiness and lack of concentration which he claimed accompanied uncontrolled fluctuations in his blood sugar levels.

Where there are discrepancies between the claimant's testimony and the medical evidence, an ALJ's determination that the claimant is not entirely credible is supported by substantial evidence. *See* Williams v. Barnhart, No. 02-4513, 2004 U.S. App. LEXIS 412, *7-*8 (3d Cir. Jan. 12, 2004); Ochs v. Comm'r of Soc. Sec., No. 05-4421, 2006 U.S. App. LEXIS 16376, *13 (3d Cir. June 29, 2006); and Sykes, 228 F.3d at 266 n.9. Thus, we conclude the ALJ did not err by finding Plaintiff's testimony less than completely credible and therefore deny Plaintiff's motion for summary judgment on this question.

3. *Failure to recognize Plaintiff's work record:*
Plaintiff's third argument is that in light of his 13-year work
record, his testimony should have been afforded substantial
credibility. (Plf.'s Brief at 13, *citing* Taybron v. Harris, 667
F.2d 412, 415 n.6 (3d Cir. 1981).) Again, we conclude the ALJ did
not err in regard to this issue.

Mr. Christl's earnings record (Tr. 45-51) shows that during
the period 1989 through 2005, he did, in fact, have reported
earnings for 16 of the 17 years in question. However, his income
was above $6,000 in only seven of those years and appears to have
been derived most years from multiple short-term and/or part-time
jobs, the exception being three years in which he worked as a car
salesman.

It is well-established that the testimony of a claimant with
a long, productive work history will be given "substantial
credibility" concerning his work limitations, assuming those
limitations are also supported by competent medical evidence.
Dobrowolsky v. Califano, 606 F.2d 403, 404, 410 (3d Cir. 1979).
However, a claimant's work history is but one of many factors an
ALJ must consider in assessing a claimant's subjective complaints.
20 C.F.R. § 404.1529(c)(3); Telesha v. Barnhart, CA No. 01-2371,
2003 U.S. Dist. LEXIS 16359, *28, n.6 (M. D. Pa. Mar. 31, 2003).
Contrary to Plaintiff's assertion that his testimony "*should have
been* afforded substantial credibility*" (Plf.'s Brief at 13,

29

emphasis added), an ALJ is not required to equate a long work history with credibility. Brubaker v. Barnhart, CA No. 05-76, 2005 U.S. Dist. LEXIS 36790, *12 (E.D. Pa. Dec. 29, 2005).

As can be seen from the brief synopses of those cases in which the court held that work history should have been given greater emphasis in assessing the claimant's credibility,[18] a significant - albeit not necessarily definitive - factor is whether the claimant continued to try to work after the alleged onset date. Here, Plaintiff apparently did not attempt to find other work after his surgery; in fact, he testified that he quit working for the spa and hot tub company in June 2005 because climbing the stairs to his

---

[18] *See* Taybron v. Harris, 667 F.2d 412, 413 (3d Cir. 1981) (plaintiff worked steadily after his accident, underwent surgery and spent 10 weeks in the hospital but was eventually forced to quit because of pain); Podedworny v. Harris, 745 F.2d 210, 213 (3d Cir. 1984) (plaintiff was forced quit the job he held for 32 years after company doctors determined he could not safely work as a crane operator due to dizziness and blurred vision); Sidberry v. Bowen, 662 F.Supp. 1037, 1038 (E.D. Pa 1986) (although plaintiff was hospitalized 18 times, she continued to work for 12 years after the onset of her condition); Murgia v. Bowen, CA 87-2789, 1988 U.S. Dist. LEXIS 1350, *2, *7 (E.D. Pa. Feb. 16, 1988) (plaintiff had an excellent 20-year work record in a well-paid position which he quit only after he developed a retinal hemorrhage and dangerously elevated blood pressure); Moyer v. Shalala, 828 F.Supp. 354, 356 (E.D. Pa. 1993) (plaintiff terminated because there was no work he could do at a naval shipyard after he suffered extensive injuries to his arm and hand in work-related accidents); Rieder v. Apfel, 115 F. Supp.2d 496, 505 (M.D. Pa. 2000) (43-year-old plaintiff worked steadily after high school and attempted to work even after she began to experience cognitive dysfunction, seizure disorder, anxiety and depression); Lang v. Barnhart, CA No. 05-1497, 2006 U.S. Dist. LEXIS 95767, *33-*36 (W.D. Pa. Dec. 6, 2006) (46-year old plaintiff worked steadily for 27 years, even after the onset of his disability, earning a substantial salary); and Gates v. Astrue, CA No. 07-202, 2008 U.S. Dist. LEXIS 64139, * 19-*20 (W.D. Pa. Apr. 14, 2008) (plaintiff worked full time for 17 years until an automobile accident, then continued to work part-time for more than a year thereafter.)

work place after the amputation "was a pretty big hassle." (Tr. 261.)[19] He further testified that in August 2005, after he moved from Pittsburgh to northwestern Pennsylvania, "as soon as I moved . . . I went to the welfare office and I put my application in for the Social Security." (Id.)

As discussed in the previous section, the ALJ was aware of numerous inconsistencies between Plaintiff's testimony and the medical records. Where such conflicts in the evidence undercut the claimant's credibility, courts have distinguished Dobrowolsky, even if the ALJ failed to explicitly discuss work history in the opinion. See, e.g., Mylod v. Barnhart, CA No. 04-5795, 2006 U.S. Dist. LEXIS 27461, *7-*8 (E.D. Pa. May 9, 2006); Stroman v. Barnhart, CA No. 03-4045, 2004 U.S. Dist. LEXIS 15372, *14-*15 (E.D. Pa. July 24, 2004); and Weidl v. Comm'r of Soc. Sec., CA No. 07-531, 2008 U.S. Dist. LEXIS 64627, *23-*25 (W.D. Pa. Aug. 21, 2008). We concur with the reasoning of those cases and conclude Judge Quigley did not err in failing to consider Plaintiff's work history in determining his credibility.

_____

[19] This testimony is inconsistent with a disability report completed August 24, 2005, in which Plaintiff indicated that he had stopped working as of March 1, 2005, when he was laid off (Tr. 56), not because of difficulty climbing stairs after his surgery in June 2005. It is also inconsistent with the list of prior employment received by the Social Security Administration on February 23, 2007, which indicates Plaintiff worked as a customer service representative for a company known as Precision Response Corp. in April and May 2005, then for Quality Spas and Hot Tubs in August 2005, again as a customer service representative. (Tr. 99.)

4. *The Vocational Expert's testimony:* Plaintiff argues that when the Vocational Expert was asked questions which incorporated "the above limitations," he testified that Plaintiff could not perform work at the substantial gainful activity level. (Plf.'s Brief at 13.) We assume, based on Plaintiff's reference to the transcript, that by "the above limitations," he is referring to those set out by Dr. Barella in the medical evaluation completed on March 23, 2006.

At the hearing the ALJ posed three questions to Mr. Edelman. First, he asked him to assume

a hypothetical person with the same age, education and work experience as Mr. Christl. Assume for purposes of this hypothetical this individual would be available [sic] to perform jobs that did not involve any climbing [of] things like ropes, ladders, scaffolds. Did not involve any driving, operating heavy moving equipment or machinery or working at unprotected heights. Could lift up to 20 pounds but only on an occasional basis, 10 pounds on a frequent basis. Could sit for up to eight hours in the course of an eight-hour day but would require the opportunity to stand up to 15 minutes every couple of hours. There's no more than occasional kneeling, bending, stooping. No balancing. No crouching. And no climbing of stairs although [sic] to get to the work place. No climbing of stairs required during the course of the job. . . .

(Tr. 279-280.)

In response, the VE identified the sedentary jobs of telephone solicitor, telephone order clerk, or assembly line worker. (Tr. 280.) When the ALJ added to the hypothetical the claimant's need to elevate his foot above head level for ten minutes every two

32

hours, the VE stated that this relief could be accomplished during regularly scheduled breaks and meal periods and therefore would not interfere with his ability to work on a full time basis. (Id.)

The ALJ then asked a follow up question:

Dr. [Barella] filled out a medical source statement of his ability to perform work related activities mentioning that Mr. Christl could lift up to 20 pounds on an occasional basis, carry only two or three pounds on an occasional basis, could stand for no more than an hour and sit for no more than six hours. That [in] itself would eliminate all full-time work for that person, wouldn't it?

(Tr. 281.)

The VE agreed that those limitations would effectively preclude any substantial gainful activity. (Id.)

As we have concluded above, Dr. Barella's medical source statement was not consistent with his own notes and with other medical evidence. A proper hypothetical question need only incorporate "every credible limitation established by the physical evidence." Plummer v. Apfel, 186 F.3d 422, 431 (3d Cir. 1999); *see also* Eyler v. Barnhart, No. 03-1816, 2003 U.S. App. LEXIS 23306, *7 (3d Cir. Nov. 13, 2003); Bowser v. Barnhart, No. 03-1629, 2004 U.S. App. LEXIS 139, *7 (3d Cir. Jan. 6, 2004); Runkey v. Comm'r of Soc. Sec., No. 07-1666, 2008 U.S. App. LEXIS 16898, *5 (3d Cir. Aug. 6, 2008). When the hypothetical question(s) satisfy this standard, the Vocational Expert's opinion is substantial evidence on which the ALJ may rely in determining whether jobs exist in the national

economy that the claimant can perform despite his impairments. Plummer, id. We conclude the ALJ did not err by relying on the answers provided by the Vocational Expert to his first and second hypothetical questions, i.e., those which incorporated only those limitations which were supported by the medical evidence.

Having considered each of Plaintiff's arguments in support of his motion for summary judgment, we find none of them persuasive, will affirm the decision of the ALJ, and grant summary judgment in favor of Defendant. An appropriate Order follows.

September _30_ , 2008                                    _William L. Standish_
                                                     William L. Standish
                                                     United States District Judge